**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Case No. 5:26-bk-00512 |
| | ) | |
| STORJ LABS, INC., | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor. | ) | Judge David L. Bissett |
| | ) | |

**ORDER GRANTING INTERIM ORDER AUTHORIZING POST-PETITION FINANCING AND USE OF CASH COLLATERAL, AND SCHEDULE FINAL HEARING**

Storj Labs, Inc., debtor in possession in the above-captioned case (the "Debtor") filed "Emergency Motion to Authorize Post-Petition Financing and Use of Cash Collateral and Schedule a Final Hearing" (hereinafter ("Emergency Motion") pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9013-1 of the United States Bankruptcy Court for the Northern District of West Virginia Local Rules (the "Local Rules"). The Debtor moved this Court for entry of an interim order ("Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), (i) authorizing Debtor to obtain post-petition financing from Inveniam Capital Partners, Inc., a Delaware Corporation ("DIP Lender"), on the terms described herein and in "Debtor-in-Possession Credit Agreement"; (ii) authorizing Debtor to use cash collateral; (iii) scheduling a final hearing with

respect to the relief requested herein; and (iv) granting related relief. On August 4, 2026, the Court held a hearing on the Emergency Motion.

Based on the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on August 4, 2026 (the "***Interim Hearing***"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

**Jurisdiction, Venue, and Statutory Predicates**

1. The United States Bankruptcy Court for the Northern District of West Virginia ("Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Debtor confirmed its consent, under Rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the requested relief are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-2, and 9013-1.

**Background**

5. Debtor provides decentralized cloud storage service, primarily to individual users and a few enterprise clients. *See* Declaration of Dr. Shuja Ali, attached hereto as Exhibit A. Debtor's key feature is the ability to provide a cheaper, more secure cloud storage service that spreads customer encrypted files across many computers worldwide instead of one data center. *Id.*

6. In 2025, Debtor started to grow the sales team in an attempt to target large enterprise clients with an aim to grow more revenues for its core product, Object Storage. *Id.* Object Mount was being primarily developed for the media and entertainment industry, but required considerable resources and failed to get traction in the target industry and other sectors. *Id.*

7. Debtor also divested from two other products, Petagene and Valdi, due to disappointing revenue and growth, resulting in the termination of the executives leading those products. *Id.*

8. Cost of payroll and technology has greatly exceeded income resulting in the Debtor currently being forced to file this chapter 11 restructuring. *Id.*

9. Debtor further was forced to file this chapter 11 on an expedited timeline due to certain key creditors asserting that they were going to take actions which could result in loss of service to clients, leading to loss of their data as it would have been unrecoverable. *Id.*

10. Those actions would cripple the Debtor's ability to continue as a viable entity and to have an opportunity to restructure in a manner that will result in a viable and successful enterprise. *Id.*

11. Debtor has aggressively taken steps to step reduce its payroll and to overall expenses. *Id.*

12. With the reduction of payroll, expenses, and certain protections afforded the Debtor by the chapter 11 bankruptcy, Debtor is confident that it has a path to emerge successfully from the chapter 11 bankruptcy. *Id.*

**Relief Requested**

By the Emergency Motion and representations by counsel, and pursuant to sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001- 2, and 9013-1, the Debtor requested that this Court enter an Interim Order and schedule a Final Order. In the Interim Order, the Debtor sought the following relief:

a. DIP Credit Agreement. Authorizing Debtor to obtain secured post-petition financing on a superpriority basis consisting of $388,000 (the "DIP Credit Agreement") to be distributed in the following installments: $100,000 immediately or soon after entry of the Interim Order; and the remaining $288,000 immediately or soon after entry of the Final Order, as enumerated substantially in the DIP Credit Agreement attached hereto as Exhibit B;

b. DIP Documents. Authorizing Debtor to execute and deliver the DIP Credit Agreement and any other agreements, instruments, notes, pledge agreements, guarantees, control agreements, and other Loan Documents (as defined in the DIP Credit Agreement) (as amended, restated, amended and restated, supplemented, waived, and/or modified from time to time, and collectively with the DIP Credit Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

c. Superpriority Administrative Priority. Granting to the DIP Lender on account of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the

"Postpetition Debt") allowed superpriority administrative expense claim status in these Chapter 11 Cases, subject only to the Carve Out as outlined in the DIP Credit Agreement;

d. Priority Liens. Granting to the DIP Lender automatically perfected first priority security interests in and liens (the "DIP Liens") on all of the real and personal property, whether now existing or hereafter acquired or arising, tangible or intangible, of Debtor as further described in the DIP Documents and the Interim Order (collectively, the "DIP Collateral"), including all property constituting "cash collateral" as defined in section 363 of the Bankruptcy Code ("Cash Collateral"), which DIP Liens shall be senior to all other liens and security interests in or against Debtor or Debtor's assets or properties except for the Prepetition Liens (solely to the extent such Prepetition Liens were validly attached and perfected prior to the Petition Date), in which case the DIP Liens shall be junior to all such validly attached and perfected Prepetition Liens as of the Petition Date, and in all cases, such DIP Liens shall be subject to the Carve Out.

e. Use of Proceeds. Authorizing Debtor to use the proceeds of the DIP Credit Agreement as permitted by the DIP Documents, including, among other things, for (i) working capital and other general corporate purposes, including expenses to continue and complete ongoing development and infrastructure projects, (ii) payment of costs and expenses, including professional fees, of administering these Chapter 11 Cases, and (iii) paying other Court-approved expenses, in each case as set forth in the Interim Budget attached hereto as Exhibit C or Budget, as applicable (each as defined in the DIP Credit Agreement) or otherwise approved in advance and in writing by the DIP Lender.

f. Payment of Postpetition Debt. Authorizing and directing Debtor to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due and payable, including the reasonable fees and disbursements of the DIP Lender's attorneys,

advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

g. Modification of the Automatic Stay. Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders;

h. Cash Collateral. Authorizing Debtor to use the Cash Collateral (as defined in the DIP Documents) and any other assets subject to the Prepetition Liens, on the terms and subject to the conditions set forth in the DIP Documents and in the DIP Orders; and

i. Final Hearing. Scheduling a final hearing within 21 days after entry of the Interim Order to consider the relief requested in the Motion on a final basis.

Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize post-petition financing for a Chapter 11 debtor-in-possession." *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991); *see also In re Gen. Growth Props., Inc.*, 423 B.R. 716, 725 (S.D.N.Y. 2010). "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition credit.'" *Id.* Section 364(c) allows debtors to grant postpetition credit—among other things—administrative claim status and a senior lien on unencumbered property of the estate. While relief under section 364(d) in granting a priming lien in connection with DIP financing is considered "extraordinary", such relief is available and granted where the current lienholders so consent to the subordination of their interests as well as where the current lienholders are adequately protected. *See Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*, 616 B.R. 14, 25 (Bankr. S.D.N.Y. 2020); *Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 689 (E.D.N.C. 2009).

As discussed below, Debtor satisfies the requirements for relief under section 364(c) and (d) of the Bankruptcy Code in respect of the DIP Facility. Furthermore, the Debtor's decision to enter into the proposed DIP Facility is in the exercise of its sound business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business). A debtor does not have a "duty to seek credit from every possible lender before concluding that such credit is unavailable" before a court can find it exercised sound business judgment. *Id.*

### A. The Requirements to Obtain Postpetition Financing Under Section 364 are Satisfied.

For a debtor to obtain senior secured debt on a priming basis, the Bankruptcy Code requires consent of the impacted creditor or "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d). Here, based upon information and belief, Debtor has no secured creditors.

Approval of the DIP Credit Agreement is appropriate because Debtor is unable to obtain credit without providing a lien senior to pre-exiting liens and the primed lender is adequately protected. *In re Murray Energy Holdings Co.*, No. 19-56885, 2022 WL 993766, at *1 (Bankr. S.D. Ohio Mar. 31, 2022); *In re Swedeland Development Group, Inc.*, 16 F.3d 552 (3d Cir.1994). As discussed in detail *infra*, while the Debtor has sought to obtain financing on a non-priming basis, it have been unable to do so.

Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a superpriority or senior secured (non-priming) basis, or both, when the court finds, after notice and a hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1)" of the Bankruptcy Code. 11 U.S.C. § 364(c).

Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

i. The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

ii. The credit transaction is necessary to preserve the assets of the estate; and

iii. The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above factors and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

i. <u>Debtor Cannot Obtain Financing on More Favorable Terms Than the DIP Credit Agreement.</u>

A debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. Bray v. *Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained*); see also Pearl-Phil GMT (Far East) Ltd. v.*

*Caldor Corp.*, 266 B.R. 575, 584 (Bankr. S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely able and willing to extend the necessary credit, let alone on advantageous terms, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support the conclusion that section 364(c) requirement was met).

As described above, prior to and following the Petition Date, Debtor with the support of its advisors engaged in good-faith negotiations and assessed its options for postpetition financing. The DIP Credit Agreement is the product of these negotiations between Debtor and the DIP Lender, both of whom are represented by their own experienced counsel and resulted in Debtor securing the most favorable terms possible under the circumstances. In fact, the interest rate agreed to in the DIP Credit Agreement is less than those approved in similar cases by this Court. Simply put, the DIP Credit Agreement provides Debtor with the liquidity it needs at the lowest cost available while simultaneously placing Debtor on an optimal path for maximizing the value of its assets and operations.

ii. <u>The DIP Credit Agreement is Necessary to Preserve the Going Concern Value of Debtor's Estate.</u>

Debtor must obtain the proposed financing to continue the operation of its business to preserve its going concern value pending completion of the chapter 11 process. Absent the financing provided by the DIP Credit Agreement, Debtor will not have the ability to meet payroll, retain key employees, or confirm a chapter 11 plan, thus limiting Debtor's ability to maximize the value of its business. Accordingly, the circumstances of this Chapter 11 Case necessitate postpetition financing under section 364(c) of the Bankruptcy Code. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (observing that a debtor-in-possession has a fiduciary duty to "protect and maximize" the value of its estate).

iii. The Terms of the DIP Credit Agreement are Fair, Reasonable, and Appropriate Under the Circumstances.

In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 866 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See* Transcript of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09- 10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now").

As further described above, the terms and conditions of the DIP Credit Agreement is fair, appropriate, reasonable, and in the best interests of Debtor, its estates, and its creditors. As set forth herein, the covenants and restrictions included in the DIP Credit Agreement is not designed to make

Debtor disproportionately susceptible to a breach of such terms, but rather are tied to liquidity and the progress of the case.

### B. Debtor Exercised Sound and Reasonable Business Judgment in Deciding to Enter Into the DIP Credit Agreement.

Debtor negotiated the DIP Credit Agreement with the DIP Lender using its sound business judgment, which should be accorded deference so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See Bray*, 789 F.2d at 1088; *see also In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("The cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, inter alia, an exercise of "sound and reasonable business judgment").

Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility, and asset-based facility based on a debtor's prudent business judgment). Thus, bankruptcy courts will generally not second-guess a debtor-in-possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14.

Debtor has exercised sound business judgment in determining the appropriateness of the DIP Credit Agreement and has satisfied the legal prerequisites to incur debt on the terms and conditions

set forth in the DIP Credit Agreement and DIP Orders. The DIP Credit Agreement contains terms and conditions that are the best available under the exigent circumstances of these cases and will provide Debtor with sufficient liquidity during the period of the Budget. *See Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing that a debtor may have to enter hard bargains to acquire funds).

The funds and liquidity to be provided by the DIP Credit Agreement is vital to enable Debtor to continue to operate during this Chapter 11 Case to allow Debtor to work towards a value-maximizing restructuring that is in the best interests of Debtor's estate, its creditors, and other stakeholders. Failure to obtain the DIP Facility will cause Debtor to be unable to meet its post-petition operating expenses in the ordinary course of business, thereby leading to the likely wind-down of Debtor's business. Moreover, access to the DIP Facility will afford Debtor's vendors and counterparties to executory contracts the necessary confidence to continue their ongoing relationships with Debtor, and will be viewed favorably by Debtor's vendors and counterparties to executory contracts, thereby enhancing the prospect for a successful reorganization.

Debtor submits that the terms and conditions of the DIP Credit Agreement are fair and reasonable under the circumstances of this Chapter 11 Case and were negotiated with the DIP Lender at arm's length and in good faith. Accordingly, Debtor requests that it be authorized to obtain post-petition financing in the form of the DIP Credit Agreement, and that the DIP Lender be granted all necessary and applicable protections contained therein and in the Interim Order.

## II. The Court Should Authorize the Debtor's Use of Cash Collateral

Section 363(c)(2) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. That provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) Each entity that has an interest in such cash collateral consents; or
>
> (B) The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

Debtor has satisfied the requirements of sections 363(c)(2) and 363(e) and should be authorized to use the Cash Collateral on the terms set forth in the Interim Order and the DIP Credit Agreement. First, the DIP Lender consents to the use of Cash Collateral. Second, Debtor intends to seek use of cash collateral over any objection (pursuant to Bankruptcy Code section 363(c)(2)(B)) in exchange for the proposed customary, reasonable, and fair adequate protection described in Part I(B) of this Motion on account of the Diminution in Value as a result of the use of Cash Collateral.

Moreover, Debtor has an urgent need to use the Cash Collateral along with the proceeds of the DIP Credit Agreement, to honor obligations critical to its ongoing operations—including to employees, vendors, and counterparties to executory contracts—critical to Debtor's efforts to reorganize. Absent access to Cash Collateral, Debtor cannot continue to operate its businesses postpetition, diminishing the value of Debtor's estate to the detriment of all stakeholders. Therefore, Debtor submits that it should be authorized to use the Cash Collateral on the terms set forth in the Interim Order and in the DIP Credit Agreement.

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien securing those loans, even if the authority of the debtor

to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

The DIP Credit Agreement is the result of arm's length, good faith negotiations between Debtor and the DIP Lender. The terms and conditions of the DIP Credit Agreement are not only fair and reasonable, but the proceeds of the DIP Credit Agreement will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents with respect thereto, other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections that section affords.

The Emergency Motion, in accordance with the terms of the DIP Credit Agreement, also requests that the automatic stay arising under section 362 of the Bankruptcy Code be modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default—but subject to any applicable notice requirements in the DIP Orders—all rights and remedies provided for in the DIP Documents, without further order of or application to the Court.

Stay modification provisions of this sort are ordinary features of debtor-in-possession financing and, in the Debtor's sound business judgment, is reasonable under the circumstances.

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2), (c)(2).

The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly after the Petition Date. As described above, Debtor must have immediate access to the DIP Agreement to pay employees, vendors, contractors, and other day-to-day expenditures. Given the immediate and irreparable harm to Debtor, its estates, and its creditors without interim relief, Debtor requests that, pending the Final Hearing, the Court approve the DIP Credit Agreement on an interim basis as set forth in this Emergency Motion.

**NOW THEREFORE**, based upon the Motion, the DIP Credit Agreement, the evidence adduced at the Interim Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. *Motion Granted.* The Motion is hereby granted, and the DIP Financing and the use of Cash Collateral is hereby authorized, in each case, upon the terms and conditions set forth in this Interim Order and the DIP Credit Agreement. Any objections to the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, are hereby denied and overruled.

2. *Authorization of DIP Credit Agreement.*

(a) *Authorization of DIP Credit Agreement.* The DIP Lender and Debtor are hereby authorized and empowered to execute, enter into and deliver, and perform under the DIP Credit Agreement and such additional documents, instruments, certificates and agreements as may be reasonably necessary or required to perform their obligations under the DIP Credit Agreement and this Interim Order and to implement the transactions contemplated thereunder and hereunder.

(b) *Authorization to Borrow.* The Debtor as the DIP borrower is hereby authorized to borrow and incur an aggregate principal amount of up to $100,000, subject to the terms and conditions set forth in the DIP Credit Agreement and this Interim Order.

(c) *Use of funds from DIP Lender and Cash Collateral.* The Debtor is hereby authorized to use the proceeds from the DIP Lender and all Cash Collateral subject to the terms and conditions set forth in the DIP Credit Agreement and this Interim Order.

(d) *DIP Fees and Expenses;* Subject to paragraph 2(b) of this Interim Order, the Debtor is hereby authorized and empowered to pay all DIP Obligations as such amounts become due and payable in accordance with this Interim Order and the DIP Credit Agreement, without the need for further order of the Court. Without limiting the foregoing, the Debtor is hereby authorized and empowered to (i) pay any and all fees, and (ii) pay all out of pocket costs and expenses of the Debtor, including, without limitation, the reasonable and documented fees and expenses of the law firm of Spilman Thomas & Battle.

(e) *Amendment of DIP Loan Documents.* The DIP Lender and Debtor are hereby authorized and empowered to execute, enter into and deliver, and perform under one or more amendments, waivers, consents or other modifications to and under the DIP Credit Agreement; provided *however,* that a copy of all amendments, waivers, consents or other modifications to and under the DIP Credit Agreement shall be provided (which may be by electronic mail) to the U.S. Trustee and counsel to the Official Committee (once appointed) no later than Ten (10) Business Days prior to the anticipated date of effectiveness thereof; *provided further, however,* that all material amendments or modifications to and under the DIP Loan Documents ("***Material DIP Amendment***") shall be filed with the Court, and if no objection to the Material DIP Amendment is made within Ten (10) calendar days of the filing of the Material DIP

Amendment, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; *provided further, however*, if an objection is made within such time period, then such Material DIP Amendment shall be subject to a hearing and approval of the Court.

3. *DIP Obligations.*

(a) Upon execution and delivery thereof, the DIP Credit Agreement shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "***Successor Cases***"), in each case, in accordance with the terms of the DIP Loan Documents and this Interim Order.

(b) Upon execution and delivery thereof, the DIP Loan Parties shall be jointly and severally liable for any and all DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease, on the DIP Termination Declaration Date (as defined below).

4. *DIP Superpriority Claims.* Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates to the extent set forth in the Bankruptcy Code (the "***DIP Superpriority Claims***"), with priority over any and all other administrative expense claims, adequate protection claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever. The DIP Superpriority Claims

shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and shall be payable by each of the Debtors on a joint and several basis.

5. *Adequate Protection*. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows:

(a) *Adequate Protection Claims*. The Prepetition Agent/Trustee, for the benefit of the Prepetition Secured Parties, is hereby granted, in the amount of any net Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims to the extent contemplated by section 507(b) of the Bankruptcy Code (the "***Adequate Protection Claims***") against each of the Debtors. The Adequate Protection Claims shall be (a) subject and subordinate only to the Carve Out and the DIP Superpriority Claims, and (b) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(b) *Adequate Protection Professional Fees and Expenses*. The DIP Loan Parties are authorized and empowered to pay all of the out of pocket fees, costs and expenses of (i) the DIP Secured Parties, including, without limitation, the reasonable and documented fees and expenses of Spilman Thomas & Battle PLLC (collectively, the "***Adequate Protection Professional Fees and Expenses***").

(c) *Reporting*. The Debtors shall provide the Prepetition Secured Parties and counsel to the Official Committee, once appointed (and their respective advisors) with all written reports required to be delivered under the DIP Credit Agreement and this Interim Order.

6. *Review of Professional Fees and Expenses.* The payment of all DIP Professional Fees and Expenses and Adequate Protection Professional Fees and Expenses hereunder shall be made without the necessity of filing fee applications with the Court or compliance with the U.S. Trustee's guidelines and shall not be subject to further application to or approval of the Court; *provided, however,* each such professional shall provide summary copies of its invoices (which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to counsel to the Debtors, the U.S. Trustee, and counsel to the Official Committee (collectively, the "***Review Parties***"). Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the affected professional within ten (10) calendar days after delivery of such invoices to the Review Parties (such ten (10) day calendar period, the "***Review Period***"). If no written objection is received prior to the expiration of the Review Period from the Review Parties, the Debtors shall promptly pay such invoices following the expiration of the Review Period. If an objection is received within the Review Period from the Review Parties, the Debtors shall promptly pay the undisputed amount of the invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court.

7. *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection

and priority of the DIP Liens, (b) the DIP Loan Parties to incur all DIP Obligations as contemplated under this Interim Order and the DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such acts as the Prepetition Agent/Trustee may request to assure the perfection and priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur all liabilities and obligations to the Prepetition Secured Parties, including all Adequate Protection Obligations, as contemplated under this Interim Order and the DIP Loan Documents, (e) subject to paragraph [●] of this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents or applicable law, and (f) the DIP Loan Parties to perform under this Interim Order and the DIP Loan Documents, and to take any and all other actions that may be reasonably necessary or required for the performance by the DIP Loan Parties under this Interim Order and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder.

8. *Carve Out.*

(a) *Priority of Carve Out*. Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Claims shall be subject and subordinate to payment of the Carve Out.

(b) *Carve Out.* The term "**Carve Out**" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) all unpaid reasonable fees and expenses up to $[●] incurred by a trustee appointed under section 726(b) of the Bankruptcy Code, (iii) to the extent allowed by the Court at any time, all accrued but unpaid fees and expenses (the

"***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***", and together with the Debtor Professionals, the "***Professional Persons***") at any time on and before the date of delivery by the DIP Agent (at the instruction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below) (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "***Pre-Carve Out Notice Amount***"), and (iv) Allowed Professional Fees.

Prepared by:

*/s/ Christopher R. Arthur*
Christopher R. Arthur (WVSB #7161)
SPILMAN THOMAS & BATTLE, PLLC
300 Kanawha Blvd. E.
Charleston, WV 25301
(304) 531-9520 *(Phone)*
(304) 291-7979 *(Facsimile)*
carthur@spilmanlaw.com