## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "Agreement") is entered into as of May 12, 2026 (the "Effective Date"), by and among Inveniam Capital Partners, Inc., a Delaware corporation (the "Borrower"), the undersigned Sellers' Representatives, acting in their capacities as the duly authorized representatives of the former shareholders of Hedgehog Invest Limited (in such capacity, the "Sellers' Representatives"), on behalf of such former shareholders in their capacities as lenders under the Note (as defined below) (individually, a "Lender" and collectively, the "Lenders"), and, solely for purposes of Section 4.8 and Articles X and XI hereof, Hedgehog Invest Limited, a limited company existing under the laws of England and Wales (the "Hedgehog Subsidiary"), and Michael Ward, an individual resident of England and Wales ("Ward").

## RECITALS

WHEREAS, reference is made to that certain 6% Secured Promissory Note, dated December 17, 2024 (as amended, restated, supplemented, or otherwise modified from time to time, the "Note"), issued by the Borrower in favor of the Lenders in the original principal amount of $9,609,265.57 in connection with the acquisition of the equity of the Hedgehog Subsidiary;

WHEREAS, the Borrower failed to make prepayments of principal and accrued interest under the Note from certain WLD Proceeds (as such term is defined in the Note) when due on October 31, 2025, and December 31, 2025 (each such failure, a "Specified Default" and collectively, the "Specified Defaults"), in the total aggregate amount of not less than $3,866,571 (the "Past-Due Amount");

WHEREAS, each Specified Default constitutes an Event of Default under the Note, entitling the Lenders to exercise all rights and remedies available under the Note, under applicable law, and in equity;

WHEREAS, the Borrower has requested that the Lenders forbear from exercising their rights and remedies with respect to the Specified Defaults for a limited period and on the terms and conditions set forth herein; and

WHEREAS, the Lenders are willing, subject to the terms and conditions of this Agreement, to forbear from exercising such rights and remedies for the limited period and on the terms set forth herein;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I: DEFINITIONS AND INTERPRETATION

**Section 1.1 Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

"Affiliate Loan" means that certain unsecured, interest-free loan advanced by Ward to the Hedgehog Subsidiary in the aggregate sum of £311,019 and documented in (a) the shareholders agreement made between the "Shareholders" (as defined therein) and the Hedgehog Subsidiary on August 17, 2022 (as amended and restated on January 31, 2023), and (b) that certain letter agreement, dated as of December 17, 2024, by and between Ward and the Hedgehog Subsidiary (collectively, the "Affiliate Loan Documents").

"Business Day" means any day other than a Saturday, Sunday, or any other day on which

commercial banks in the State of New York are authorized or required by law to close.

"Change in Control Transaction" shall mean, directly or indirectly, (a) the closing of the sale, transfer or other disposition of all or substantially all of Borrower's assets, or the exclusive license of all or substantially all of Borrower's material intellectual property, (b) the consummation of the merger or consolidation of Borrower or any of its subsidiaries with or into another entity, or any other corporate reorganization (except a merger or consolidation in which the ultimate beneficial holders of the capital stock of Borrower immediately prior to such merger or consolidation continue to beneficially hold at least a majority of the voting power of the capital stock of Borrower, or the surviving or acquiring entity), (c) the closing of the transfer (whether by merger, consolidation, share exchange or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of Borrower's securities), of Borrower's securities if, after such closing, such person or group of affiliated persons would hold at least a majority of the voting power of the capital stock of Borrower, or the surviving or acquiring entity (except a transfer in which the ultimate beneficial holders of the capital stock of Borrower immediately prior to such merger or consolidation continue to beneficially hold at least a majority of the voting power of the capital stock of Borrower, or the surviving or acquiring entity), or (d) a liquidation, dissolution or winding up of Borrower.

"Collateral" means the assets set forth on **Exhibit A** hereto.

"Corporate Transaction" shall mean, directly or indirectly, (a) the closing of the sale, transfer or other disposition of any material portion of the assets of Borrower or any of its subsidiaries, or the exclusive license of any material intellectual property of Borrower or any of its subsidiaries, (b) the consummation of the merger or consolidation of Borrower, or any of its subsidiaries with or into another entity, or any other spin out, joint venture arrangement, recapitalization, contribution, or similar corporate reorganization, or (c) the closing of the transfer (whether by merger, consolidation, share exchange, share offering, or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of securities), of any securities of Borrower or any of its subsidiaries, in each case, other than a Change in Control Transaction.

"GCC Investor" means the counterparty to the Term Sheet, which Borrower has previously identified to the Sellers' Representatives in writing.

"Loan Documents" means the Note, this Agreement, the Security Agreement, the Affiliate Loan Documents, and all other documents, instruments, and agreements executed in connection therewith or herewith.

"Pending Investment" means the transactions contemplated by the Term Sheet, and any alternative, replacement, or substitute transaction thereof.

"Permitted Liens" means any lien (a) possessory in nature arising solely by virtue of any statutory or common law provision; (b) arising in connection with (and contemporaneously with the consummation of) the Pending Transaction, but only to the extent the proceeds thereof are simultaneously used to discharge Borrower's obligations hereunder and under the Note in full, or (c) incurred in connection with (and contemporaneously with the consummation of) any Corporate Transaction or other financing transaction, including any equity, debt, convertible, asset-based, token-based, or other capital-raising transactions, the proceeds of which are simultaneously used to discharge Borrower's obligations hereunder and under the Note in full.

"Permitted Transfer" means the sale, transfer, conveyance, assignment or other disposition of any Collateral in a transaction the proceeds of which will simultaneously be used to discharge Borrower's

obligations in full hereunder and under the Note.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, governmental authority, or any other entity.

"Security Agreement" means the Security Agreement, in the form attached hereto as **Exhibit B**, executed and delivered by the Borrower pursuant to Section 3.1(b) hereof.

"Security Package" means the Security Agreement and all related filings, financing statements, and ancillary documentation necessary to perfect the Lenders' security interest in the Collateral.

"Sellers' Representatives" means Michael Ward and Robert Lamb, acting in their respective capacities as the duly authorized representatives of the Lenders, with full power and authority to execute this Agreement and the other Loan Documents (on behalf of the Lenders), to give and receive notices hereunder, and to take all actions (on behalf of the Lenders) as contemplated by this Agreement.

"SPA" means that certain Stock Purchase Agreement, dated as of December 17, 2024, by and among Borrower and the Lenders.

"Spinout" means a sale, transfer or other disposition of any asset of Borrower or any of its subsidiaries, or the exclusive license of any material intellectual property of Borrower or any of its subsidiaries in a spinout transaction pursuant to which (a) such assets or intellectual property is contributed or exclusively licensed to a newly-formed special purpose vehicle ("SPV") in which Borrower shall own a majority of the voting power of the capital stock of such SPV, and (b) the SPV raises debt or equity capital the proceeds of which shall be exclusively retained in the SPV to exclusively fund the ordinary course business operations of the SPV.

"Term Sheet" means that certain draft Non-Binding Term Sheet, dated as of March 7, 2026, by and between Borrower and the GCC Investor (together with all other affiliates thereof, collectively, the "GCC Investor Group").

**Section 1.2 Interpretation.** Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Note.

## ARTICLE II: ACKNOWLEDGMENTS AND FORBEARANCE

**Section 2.1 Acknowledgments by Borrower.** The Borrower hereby acknowledges and agrees that:

(a) As of the Effective Date, the aggregate outstanding Principal Amount under the Note, together with all accrued and unpaid interest, fees, costs, and expenses, is $10,731,497.41, which amount is unconditionally owed to the Lenders and is not subject to any defense, counterclaim, offset, or reduction of any kind;

(b) The Specified Defaults have occurred and are continuing, each of which constitutes an Event of Default under the Note;

(c) As a result of the Specified Defaults, the Lenders are entitled to exercise any and all rights and remedies available under the Note, under applicable law, and in equity, including, without limitation, acceleration of the entire unpaid Principal Amount and all accrued interest thereon;

(d) The Borrower has no claims, defenses, setoffs, or counterclaims against the Lenders, and all obligations of the Borrower under the Note and the other Loan Documents are valid, binding, and enforceable in accordance with their terms;

(e) The Lenders' agreement to forbear hereunder is made in reliance upon the representations, warranties, and covenants of the Borrower set forth herein, and such forbearance would not be granted but for such reliance; and

(f) This Agreement does not constitute, and shall not be construed as, a waiver, modification, or novation of the Note or any other Loan Document, nor a waiver of any Event of Default (including the Specified Defaults).

**Section 2.2 Forbearance.** Subject to the terms and conditions of this Agreement, including the satisfaction of all conditions precedent set forth in Article III and the continued compliance by the Borrower and its affiliates with all of its and their respective obligations under the Loan Documents, the Lenders agree to forbear from exercising their rights and remedies under the Loan Documents and applicable law solely with respect to the Specified Defaults during the period (the "Forbearance Period") commencing on the Effective Date and ending on the earliest to occur of (a) the occurrence of any Forbearance Default Event; or (b) 11:59 p.m. (Eastern Time) on December 31, 2027.

**Section 2.3 Scope of Forbearance.** The forbearance set forth in Section 2.2 is limited solely to the Specified Defaults and does not extend to any other Event of Default under the Note or any breach or default under this Agreement or any other Loan Document. The Lenders expressly reserve all of their rights and remedies with respect to any Event of Default (including the Specified Defaults), except as otherwise expressly set forth in Section 2.2. Nothing herein shall be deemed to obligate the Lenders to extend, renew, or otherwise modify the forbearance granted hereunder.

**Section 2.4 Interest During Forbearance Period.** At all times during the Forbearance Period, the outstanding Principal Amount shall continue to accrue interest at the Default Rate specified in the Note. All accrued and unpaid interest shall be due and payable in accordance with the payment schedule set forth in Article IV.

## ARTICLE III: CONDITIONS PRECEDENT

**Section 3.1 Conditions to Effectiveness.** The effectiveness of this Agreement and the Lenders' obligation to forbear under Section 2.2 hereof is subject to the prior satisfaction (or waiver in writing by the Sellers' Representatives in their sole discretion on behalf of the Lenders) of each of the following conditions precedent:

(a) Security Agreement. The Borrower shall have executed and delivered to the Sellers' Representatives (on behalf of the Lenders) the Security Agreement, granting the Lenders a perfected, senior security interest in all of the Collateral to secure all obligations of the Borrower under the Note and this Agreement.

(b) Perfection of Security Interest. The Borrower shall have delivered to the Sellers' Representatives (on behalf of the Lenders) all filings, financing statements (including UCC-1 financing statements), and ancillary documentation necessary to perfect the Lenders' senior security interest in the Collateral, in each case in form and substance satisfactory to the Sellers' Representatives (on behalf of the Lenders).

(c) Organizational Documents and Approvals. The Borrower shall have delivered to the

Sellers' Representatives (on behalf of the Lenders): (i) certified copies of the Borrower's Certificate of Incorporation and Bylaws; (ii) resolutions of the Borrower's board of directors authorizing the execution, delivery, and performance of this Agreement and the Security Package; (iii) a certificate of good standing from the Delaware Secretary of State; and (iv) such other organizational documents and approvals as the Lenders may reasonably request.

(d) Share Certificates and Stock Ledger. The Borrower shall have delivered to the Sellers' Representatives (on behalf of the Lenders) a certified copy of the Borrower's stock ledger, showing the shares of Borrower acquired by the Lenders pursuant to the SPA as issued, outstanding, and held of record by such Lenders.

(e) Representations and Warranties. All representations and warranties of the Borrower set forth in Article V hereof shall be true and correct in all respects as of the Effective Date.

(f) No Default. No Event of Default (other than the Specified Defaults) shall have occurred and be continuing.

(g) Other Documents. The Borrower shall have executed and delivered such other documents, instruments, and agreements as the Lenders may reasonably request in connection with this Agreement.

## ARTICLE IV: PAYMENT SCHEDULE

**Section 4.1 Scheduled Payments.** The Borrower shall make the following payments to the Lenders in immediately available funds:

(a) Initial Payment. On or before July 31, 2026, the Borrower shall pay to the Lenders the sum of One Million Dollars ($1,000,000) (the "Initial Payment").

(b) Second Payment. On or before December 31, 2026, the Borrower shall pay to the Lenders an amount equal to thirty percent (30%) of the Principal Amount remaining after application of the Initial Payment, together with all accrued and unpaid interest thereon (the "Second Payment").

(c) Third Payment. On or before June 30, 2027, the Borrower shall pay to the Lenders an amount equal to the sum of the Second Payment plus all interest accrued on the remaining unpaid Principal Amount for the period from January 1, 2027 (the "Third Payment").

(c) Fourth Payment. On or before December 31, 2027, the Borrower shall pay to the Lenders the entire remaining unpaid Principal Amount remaining after application of the Initial Payment, the Second Payment, and the Third Payment, together with all accrued and unpaid interest thereon (the "Fourth Payment").

**Section 4.2 Acceleration Upon Pending Investment.** Upon the consummation of the Pending Investment prior to full payment of the Note and all of Borrower's obligations hereunder, Borrower shall, concurrent with the payment of any cash consideration to the GCC Investor thereunder, pay to the Lenders the entire unpaid Principal Amount then outstanding, together with all accrued and unpaid interest thereon, plus all reasonable and documented out-of-pocket costs, fees, and expenses (including reasonable attorneys' fees) owed by the Borrower to the Lenders pursuant to Section 11.10 hereof. Borrower shall use its (and shall cause each other member of the Buyer's Group and their respective affiliates to use their respective) best efforts to enter into definitive transaction documents governing the Pending Investment on substantially the terms set forth in the Term Sheet and to promptly consummate the same as promptly as practicable; provided that, for the avoidance of doubt, the Borrower can provide no current assurances

concerning the timing or certainty of the consummation of Pending Investment.

**Section 4.3 Acceleration Upon Change in Control Transaction.** In the event of any Change in Control Transaction (other than the Pending Investment) prior to full payment of the Note and all of Borrower's obligations hereunder, then Borrower shall, concurrent with the closing of such Change in Control Transaction, pay to the Lenders the greater of (a) the entire unpaid Principal Amount then outstanding, together with all accrued and unpaid interest thereon, plus all reasonable and documented out-of-pocket costs, fees, and expenses (including reasonable attorneys' fees) owed by the Borrower to the Lenders pursuant to Section 11.10 hereof, or (b) such amount as would have been payable to the Lenders if the unpaid portion of the Principal Amount and all accrued and unpaid interest thereon was converted into capital stock of Borrower pursuant to Article VI hereof immediately prior to the closing of such Change in Control Transaction.

**Section 4.4 Acceleration Upon Corporate Transaction.** In the event of any Corporate Transaction (other than the Pending Investment or a Spinout) prior to full payment of the Note and all of Borrower's obligations hereunder, then Borrower shall, concurrent with the closing of such Corporate Transaction, pay to the Lenders fifty percent (50%) of all net cash proceeds thereof (including cash arising from the subsequent liquidation of non-cash assets received in respect of any such Corporate Transaction, to the extent such cash is actually received by Borrower or any other member of the Buyer's Group), up to an amount not in excess of the entire unpaid Principal Amount then outstanding, together with all accrued and unpaid interest thereon, plus all reasonable and documented out-of-pocket costs, fees, and expenses (including reasonable attorneys' fees) owed by the Borrower to the Lenders pursuant to Section 11.10 hereof.

**Section 4.5 Application of Payments.** All payments received by the Lenders under this Article IV shall be applied in the following order: first, to all reasonable and documented out-of-pocket costs, fees, and expenses (including reasonable attorneys' fees) owed by the Borrower to the Lenders pursuant to Section 11.10 hereof; second, to accrued and unpaid interest on the Principal Amount; and third, to the unpaid Principal Amount.

**Section 4.6 Manner of Payment.** All payments shall be made by wire transfer of immediately available funds to such account or accounts as the Sellers' Representatives shall designate in writing on behalf of the Lenders. If any payment falls due on a day that is not a Business Day, such payment shall be due on the immediately preceding Business Day.

**Section 4.7 Lender Cooperation.** The Sellers' Representatives (for and on behalf of the Lenders) shall cooperate in good faith with Borrower in the consummation of the Pending Investment, any Change in Control Transaction, or any other Permitted Transfer, in each case the cash proceeds of which will be used to discharge Borrower's obligations in full hereunder and under the Note simultaneously with the consummation thereof, including by delivering customary payoff letters to the counterparty(ies) to any such transaction specifying the aggregate amount of Borrower's obligations hereunder and under the Note (including principal, interest, fees, and expenses) that are outstanding as of the closing of such transaction and providing for release of all liens and encumbrances arising under the Security Package upon payment of such aggregate amount. For the avoidance of doubt, neither the Sellers' Representatives nor any Lender shall be under any such obligation in respect of any such transaction or transfer that does not involve the discharge of Borrower's obligations in full hereunder and under the Note simultaneously with the consummation thereof.

**Section 4.8 Affiliate Loan.** Each of Borrower and the Hedgehog Subsidiary acknowledge and agree that (a) as of the Effective Date, the aggregate outstanding principal amount under the Affiliate Loan is £311,019, which amount is unconditionally owed to Ward and is not subject to any defense, counterclaim,

offset, or reduction of any kind; (b) neither the Hedgehog Subsidiary nor any other member of the Buyer's Group has any claims, defenses, setoffs, or counterclaims against Ward in respect of the Affiliate Loan, and all obligations of the Hedgehog Subsidiary under the Affiliate Loan are valid, binding, and enforceable in accordance with its terms; and (c) contemporaneously with the payment in full of the unpaid Principal Amount and all accrued interest thereon pursuant to this Section 4.7, the Hedgehog Subsidiary shall (and Borrower shall cause the Hedgehog Subsidiary to) pay to Ward all unpaid principal amounts then outstanding under the Affiliate Loan.

## ARTICLE V: REPRESENTATIONS AND WARRANTIES

**Section 5.1 Representations and Warranties of the Borrower.** The Borrower hereby represents and warrants to the Lenders as of the Effective Date and as of the date of each payment hereunder as follows:

(a) Organization and Good Standing. The Borrower is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the corporate power and authority to own its properties and to carry on its business as now being conducted.

(b) Authorization and Enforceability. The execution, delivery, and performance of this Agreement and the other Loan Documents to which the Borrower is a party have been duly authorized by all necessary corporate action on the part of the Borrower. This Agreement and the other Loan Documents constitute the legal, valid, and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and to general principles of equity.

(c) No Conflicts. The execution, delivery, and performance of this Agreement and the other Loan Documents do not and will not: (i) violate any provision of the Borrower's organizational documents; (ii) violate any applicable law, rule, or regulation; (iii) conflict with, result in a breach of, or constitute a default under any material agreement or instrument to which the Borrower is a party or by which any of its assets are bound; or (iv) result in the creation or imposition of any lien on any assets of the Borrower, except as contemplated by the Security Package.

(d) No Consents Required. No consent, approval, authorization, or order of, or filing, registration, or qualification with, any governmental authority or other person is required in connection with the execution, delivery, and performance of this Agreement or the other Loan Documents by the Borrower.

(e) Capitalization. Attached as **Exhibit C** hereto is (i) a true and complete description of the capitalization of each of Inveniam Capital Partners Management, Inc. ("ICPM"), and Borrower as of the Effective Date, and no Person has any right to acquire any equity interest in the Borrower except as disclosed therein, and (ii) a true and complete organizational chart of Borrower and its subsidiaries.

(f) Ownership of Collateral. The Borrower is the sole legal and beneficial owner of the Collateral, free and clear of all liens, claims, and encumbrances, except for Permitted Liens and the security interests granted to the Lenders pursuant to the Security Package. The Borrower has the right and authority to grant a security interest in the Collateral to the Lenders. As of the Effective Date, neither Borrower nor any other member of Buyer's Group is a party to or bound by, nor do any of them have any rights under, any agreement, contract, grant, award, memorandum, letter of intent, or other document, arrangement, or understanding under which any Mantra or OM Tokens have been or are to be received thereby from MANTRA Group Holdings Limited ("MGH"), MANTRA CHAIN ASSOCIATION, or any other affiliated entity, other than as identified on Exhibit A hereto (collectively, the "MANTRA Agreements"), provided that any Mantra or OM Tokens acquired as a result of the Borrower's potential purchase of MGH are

expressly excluded from the M MANTRA Agreements and from the Collateral. The Borrower covenants and agrees that it shall not, and shall not permit any other member of Buyer's Group to, amend, modify, restate, waive, or terminate any the MANTRA Agreements in each case in a manner which adversely affects the Lenders' rights hereunder without the prior written consent of the Sellers' Representatives.

(g) Accuracy of Financial Information. Borrower has delivered to the Sellers' Representatives (on behalf of the Lenders) the unaudited, consolidated financial statements of the Borrower and its subsidiaries as of December 31, 2025, and for the year then ended (the "Most Recent Financial Statements"). The Most Recent Financial Statements and any other financial statements and other financial information provided by the Borrower to the Sellers' Representatives or any Lender in connection with this Agreement and the other Loan Documents are true, complete, and accurate in all material respects as of the dates indicated and, except as set forth on Schedule 5.1(g) attached hereto, have to the best of Borrower's knowledge been prepared in accordance with generally accepted accounting principles, consistently applied.

(h) No Litigation. Except as set forth on Schedule 5.1(h) attached hereto, there is no action, suit, proceeding, or investigation pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower that could reasonably be expected to have a material and adverse effect on the Borrower's ability to perform its obligations under this Agreement or the other Loan Documents.

(i) Absence of Certain Proceedings. Neither Borrower nor any of its subsidiaries has adopted (nor does Borrower or any such subsidiary have any current plans to adopt) a plan of complete or partial liquidation, dissolution, consolidation, restructuring, recapitalization or other reorganization other than as disclosed on Schedule 5.1(i), nor has any bankruptcy, insolvency, reorganization, or similar proceeding been threatened or instituted by or against Borrower or any of its subsidiaries.

## ARTICLE VI: EQUITY CONVERSION RIGHT

**Section 6.1 Grant of Equity Conversion Right.** At any time, in addition to all other rights and remedies available to the Lenders, the unpaid portion of the Principal Amount and all accrued and unpaid interest thereon shall be convertible, at the sole election of the Sellers' Representatives (on behalf of the Lenders), into shares of the Borrower's Class D Preferred Stock or such other class of preferred stock as is contemplated by the "SAR" (as such term is defined in the Term Sheet), at a per share conversion price equal to the per share conversion price applicable under the SAR (the "Equity Conversion Right").

**Section 6.2 Exercise of Equity Conversion Right.** The Sellers' Representatives may exercise the Equity Conversion Right on behalf of the Lenders at any time by delivering written notice thereof to the Borrower. Upon receipt of such notice, the Borrower shall promptly (and in no event later than ten (10) Business Days following receipt of such notice): (a) take all necessary corporate action to authorize and issue the shares of preferred stock to the Lenders; (b) deliver to the Sellers' Representatives on behalf of each Lender one or more stock certificates evidencing such shares; and (c) update its stock ledger to reflect the issuance of such shares to the Lenders.

**Section 6.4 Cumulative Remedies.** The Equity Conversion Right is in addition to, and not in limitation of, any other rights or remedies available to the Lenders under this Agreement, the Note, the other Loan Documents, or applicable law.

## ARTICLE VII: FORBEARANCE DEFAULT EVENTS

**Section 7.1 Forbearance Default Events.** The occurrence of any of the following events shall

constitute a "Forbearance Default Event," and the Forbearance Period shall automatically and immediately terminate upon such occurrence without any notice or demand by the Lenders:

(a) Failure by the Borrower to make any payment in full when due hereunder;

(b) Failure by the Borrower to provide any Financing Notification required under Section 8.2 hereof, if Borrower would have been required hereunder or under the Note to make any payment to the Lenders as a result of the Corporate Transaction or other financing transaction relating thereto;

(c) Failure by the Borrower to make any mandatory prepayment under the Note when due;

(d) Any material breach by the Borrower of this Agreement or the Security Agreement;

(e) The occurrence of any Event of Default under the Note (other than the Specified Defaults);

(f) Any sale, transfer, assignment, conveyance, or other disposition of any Collateral other than pursuant to a Permitted Transfer, or the creation or imposition of any lien or encumbrance on any Collateral other than a Permitted Lien, in each case without the prior written consent of the Sellers' Representatives (for and on behalf of the Lenders);

(g) Any representation or warranty made by the Borrower herein or in any other Loan Document proving to have been false or misleading in any material respect when made;

(h) The commencement of any bankruptcy, insolvency, reorganization, or similar proceeding by or against the Borrower, and such proceeding remains unstayed and in effect for more than thirty (30) days; or

(i) The entry of any judgment against the Borrower in an amount exceeding $500,000 that remains unsatisfied or unstayed for a period of thirty (30) days.

**Section 7.2 Remedies Upon Forbearance Default Event.** Upon the occurrence of any Forbearance Default Event:

(a) The Forbearance Period shall immediately and automatically terminate;

(b) The Lenders may, without further notice to or demand upon the Borrower, exercise any and all rights and remedies available to the Lenders under the Loan Documents, under applicable law, or in equity, including, without limitation: (i) accelerating the entire unpaid Principal Amount and all accrued interest thereon; (ii) enforcing the Lenders' security interest in the Collateral, including by foreclosing on and disposing of the Collateral in accordance with the Uniform Commercial Code; and (iii) exercising the Equity Conversion Right with respect to any unpaid portion of the Principal Amount and accrued interest;

(c) All obligations of the Sellers' Representatives and the Lenders under this Agreement shall immediately terminate; and

(d) The Borrower shall promptly pay all reasonable and documented out-of-pocket costs, fees, and expenses (including reasonable attorneys' fees) actually incurred by the Sellers' Representatives and the Lenders in enforcing their rights and remedies hereunder pursuant to Section 11.10 hereof.

## ARTICLE VIII: COVENANTS

**Section 8.1 Affirmative Covenants.** During the Forbearance Period, the Borrower shall:

(a) Maintain Corporate Existence. Preserve and maintain its corporate existence and good standing in its jurisdiction of organization and in each other jurisdiction where failure to do so could have a material and adverse effect;

(b) Maintain Insurance. Maintain insurance with responsible insurance companies in such amounts and against such risks as is customary for companies engaged in similar businesses, and upon request, provide evidence of such insurance to the Lenders;

(c) Pay Taxes. Except as otherwise set forth on Schedule 8.1(c) attached hereto, pay when due all taxes, assessments, and governmental charges, except those being contested in good faith by appropriate proceedings and for which adequate reserves have been established;

(d) Financial Reporting. Deliver to the Sellers' Representatives (on behalf of the Lenders): (i) Borrower's regularly prepared, quarterly financial statements; and (ii) Borrower's regularly prepared, annual financial statements, within thirty (30) days following the delivery thereof to and approval by Borrower's board of directors;

(e) Comply with Laws. Comply in all material respects with all applicable laws, rules, regulations, and orders;

(f) Maintain Collateral. Maintain the Collateral in good condition and repair, and not permit any waste or impairment thereof;

(g) Reservation of Shares. At all times during the Forbearance Period, reserve and keep available out of its authorized but unissued shares of Class D Preferred Stock (or such other class of preferred stock as may be designated by the Lenders pursuant to Article VI), a number of shares sufficient to permit the full exercise of the Equity Conversion Right set forth in Article VI, assuming conversion of the entire unpaid Principal Amount and all accrued and unpaid interest thereon as of the date of determination; and

(h) Further Assurances. Execute and deliver such additional documents and instruments, and take such further actions, as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement.

**Section 8.2 Financing Notifications.** The Borrower shall provide written notice to the Lenders within seven (7) days after the execution and delivery thereby of any definitive agreement governing any Corporate Transaction or any other financing transaction, including any equity, debt, convertible, asset-based, token-based, or other capital-raising transactions either yielding at least One Million Dollars ($1,000,000) of net proceeds or triggering a required payment to Lenders hereunder or under the Note. Each such notice shall include reasonable detail regarding: (i) the nature of the transaction; (ii) the total proceeds received; (iii) the identity of the counterparty(ies) to such transaction (subject to such customary confidentiality undertakings in respect thereof by the Sellers' Representatives as may reasonably be required by such counterparty(ies)); and (iv) the key economic terms of such transaction, subject, in each case, to the execution and delivery of a customary confidentiality and non-disclosure agreement by the Sellers' Representatives (for and on behalf of the Lenders) in respect of such information to the extent required by the counterparty(ies) to such transaction.

**Section 8.3 Negative Covenants.** During the Forbearance Period, the Borrower shall not, without the prior written consent of the Lenders:

(a) No New Indebtedness. Incur, assume, or guarantee any indebtedness for borrowed money,

to the extent any such indebtedness is secured by any Collateral or is senior in payment to Borrower's obligations hereunder or under the Note, unless the proceeds of such indebtedness will simultaneously be used to discharge Borrower's obligations in full hereunder and under the Note;

(b) No Liens on Collateral. Create, incur, assume, or permit to exist any lien or encumbrance on any Collateral, except for Permitted Liens and the security interests granted to the Lenders under the Security Package;

(c) No Asset Sales. Sell, transfer, convey, assign, or otherwise dispose of the Collateral, other than as a Permitted Transfer;

(d) No Distributions. Declare or pay any dividend or make any other distribution on or in respect of its capital stock, or redeem, purchase, or otherwise acquire any of its capital stock;

(e) No Affiliate Transactions. Enter into any transaction with any affiliate, except on terms no less favorable to the Borrower than would be obtained in an arm's-length transaction with an unaffiliated third party; and

(f) No Amendments. Amend, modify, or waive any provision of its organizational documents in any manner that would adversely affect the Lenders in any material respect.

## ARTICLE IX: RESERVATION OF RIGHTS; NO WAIVER

**Section 9.1 Reservation of Rights.** The Lenders expressly reserve all of their rights and remedies under the Loan Documents, under applicable law, and in equity, including, without limitation, all rights and remedies arising from or relating to the Specified Defaults. Except for the limited forbearance expressly set forth in Section 2.2 hereof, nothing in this Agreement shall be deemed or construed to: (a) constitute a waiver of any Event of Default (including the Specified Defaults) or any breach of any Loan Document; (b) modify or amend any term or condition of the Note or any other Loan Document; (c) establish a course of dealing between the parties; or (d) obligate the Lenders to grant any further forbearance, extension, amendment, or waiver.

**Section 9.2 No Novation.** This Agreement is not intended to, and shall not, constitute a novation of the Note or any other Loan Document, and the Note and the other Loan Documents remain in full force and effect in accordance with their respective terms, as supplemented and modified hereby.

## ARTICLE X: RELEASE AND INDEMNIFICATION

**Section 10.1 Release by Borrower.** As a material inducement to the Lenders and Ward to enter into this Agreement, each of Borrower and the Hedgehog Subsidiary, on behalf of itself and its parent entities, subsidiaries, and affiliates, and its and their respective officers, directors, managers, shareholders, members, and partners, and all successors, assigns, heirs, agents, and representatives thereof (collectively, the "Releasing Parties"), hereby irrevocably and unconditionally releases, acquits, and forever discharges each of the Sellers' Representatives, the Lenders, Ward and their respective parent entities, subsidiaries, and affiliates, and all officers, directors, managers, shareholders, members, partners, successors, assigns, heirs, agents, and representatives thereof (collectively, the "Released Parties") from any and all claims, demands, liabilities, obligations, damages, costs, expenses, actions, and causes of action of every kind and nature, whether known or unknown, suspected or unsuspected, fixed or contingent, including those arising out of or in any way related to the Note, the Loan Documents, or the transactions contemplated thereby, from the beginning of time through the Effective Date (collectively, the "Released Claims"); provided that the Released Claims shall not include any claims arising hereunder after the Effective Date.

**Section 10.2 Representation Regarding No Prior Assignment of Claims.** Each of Borrower and the Hedgehog Subsidiary hereby represents and warrants to the Lenders, the Sellers' Representatives and Ward that, as of the Effective Date: (a) neither the Borrower, the Hedgehog Subsidiary, nor any of the other Releasing Parties has sold, assigned, transferred, conveyed, pledged, hypothecated, or otherwise disposed of any of the Released Claims or any interest therein to any Person; (b) neither the Borrower, the Hedgehog Subsidiary, nor any of the other Releasing Parties has granted any Person any right, title, or interest in or to any of the Released Claims; and (c) the Borrower, the Hedgehog Subsidiary, and each of the other Releasing Parties has the full right, power, and authority to release the Released Claims as provided in Section 10.1 hereof. Each of Borrower and the Hedgehog Subsidiary acknowledges that the Lenders, the Sellers' Representatives and Ward are entering into this Agreement in reliance upon the truth and accuracy of the foregoing representation and warranty.

**Section 10.3 Indemnification for Assigned Claims.** Each of Borrower and the Hedgehog Subsidiary shall jointly and severally indemnify, defend, and hold harmless the Released Parties from and against any and all claims, demands, liabilities, obligations, losses, damages, costs, and expenses (including reasonable attorneys' fees and expenses) arising out of or in connection with any claim, action, suit, or proceeding asserted or brought against any Released Party by any Person claiming to be an assignee, transferee, or successor-in-interest of any Released Claim or any portion thereof, or otherwise claiming any right, title, or interest in or to any Released Claim. This indemnification obligation shall survive the termination or expiration of this Agreement and the payment in full of all obligations under the Note and the other Loan Documents.

## ARTICLE XI: MISCELLANEOUS

**Section 11.1 Governing Law.** This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of law that would result in the application of the laws of any other jurisdiction.

**Section 11.2 Jurisdiction and Venue.** Each party hereby irrevocably submits to the exclusive jurisdiction of the courts of the State of Delaware located in New Castle County and the United States District Court for the District of Delaware for the purpose of any action or proceeding arising out of or relating to this Agreement. Each party waives any objection to venue in such courts and any claim that such forum is inconvenient. Each party agrees that service of process in any action or proceeding arising out of or relating to this Agreement may be effected by delivering such process in accordance with the notice provisions set forth in Section 11.4 hereof, and such service shall be effective for all purposes as if personally served.

**Section 11.3 Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**Section 11.4 Notices.** Any notice, consent or other communication required or permitted to be given under this Note to any party shall be given in accordance with the requirements and subject to the terms and conditions set forth in Section 9 of the SPA.

**Section 11.5 Entire Agreement.** This Agreement, together with the other Loan Documents, constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, among the

parties relating to the subject matter hereof.

**Section 11.6 Amendments and Waivers.** No amendment, modification, or waiver of any provision of this Agreement shall be effective unless in writing and signed by the parties hereto. No waiver of any breach or default shall be deemed a waiver of any other or subsequent breach or default.

**Section 11.7 Severability.** If any provision of this Agreement is held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

**Section 11.8 Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that the Borrower may not assign any of its rights or obligations hereunder without the prior written consent of the Lenders.

**Section 11.9 Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Delivery of an executed counterpart by facsimile or electronic transmission (including PDF) shall be effective as delivery of an original executed counterpart.

**Section 11.10 Costs and Expenses.** On or before July 31, 2026, the Borrower shall pay all reasonable and documented out-of-pocket costs, fees, and expenses of the Sellers' Representatives (including reasonable attorneys' fees and expenses) incurred (on behalf of the Lenders) through the Effective Date in connection with the negotiation, preparation, execution, and delivery of this Agreement and the other Loan Documents; provided that Borrower's obligations therefor shall not exceed One Hundred Thousand Dollars ($100,000). The Borrower shall pay within thirty (30) days following demand all other reasonable and documented out-of-pocket costs, fees, and expenses of the Sellers' Representatives incurred (including reasonable attorneys' fees and expenses) incurred on behalf of the Lenders in connection with the negotiation, preparation, execution, delivery, and enforcement of this Agreement and the other Loan Documents.

**Section 11.11 Time of the Essence.** Time is of the essence with respect to all obligations of the Borrower and the Hedgehog Subsidiary under this Agreement.

**Section 11.12 Specific Performance.** Each of Borrower and the Hedgehog Subsidiary acknowledges and agrees that the Lenders and Ward would be irreparably harmed by any breach or threatened breach of their respective obligations under this Agreement and that monetary damages alone would not be an adequate remedy for such breach. Accordingly, each of Borrower and the Hedgehog Subsidiary agrees that, in addition to any other remedies available to the Lenders and Ward at law or in equity, each of the Lenders (and the Sellers' Representatives acting on their behalf) and Ward shall be entitled to seek and obtain specific performance, injunctive relief, or other equitable remedies to enforce the obligations of Borrower and the Hedgehog Subsidiary under this Agreement, without the necessity of proving actual damages or posting any bond or other security. Each of Borrower and the Hedgehog Subsidiary hereby waives any defense that a remedy at law is adequate and any requirement that the Lenders or Ward post bond or other security as a condition to obtaining such relief.

**Section 11.13 Headings.** The headings in this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

[*Signature page follows.*]

IN WITNESS WHEREOF, the parties hereto have executed this Forbearance Agreement as of the date first written above.

**BORROWER:**

**INVENIAM CAPITAL PARTNERS, INC.**

Robert Yablunsky (2026-05-12 15:40:05 EDT)

By: ______________________________

Name: Robert Yablunsky

Title: EVP

**LENDERS:**

Michael Ward (2026-05-12 21:45:42 GMT+1)

______________________________

Michael Ward, in his capacity as Sellers' Representative for and on behalf of the Lenders

Rob Lamb (2026-05-12 21:20:40 GMT+1)

______________________________

Robert Lamb, in his capacity as Sellers' Representative for and on behalf of the Lenders

**HEDGEHOG SUBSIDIARY,**
**solely for purposes of Section 4.8 and Articles X and XI hereof:**

**HEDGEHOG INVEST LIMITED**

Robert Yablunsky (2026-05-12 15:40:05 EDT)

By: ______________________________

Name: Robert Yablunsky

Title: EVP

**WARD,**
**solely for purposes of Section 4.8 and Articles X and XI hereof:**

Michael Ward (2026-05-12 21:45:42 GMT+1)

______________________________

Michael Ward, in his individual capacity

[*Signature Page to Forbearance Agreement*]

# EXHIBIT A

## COLLATERAL

The Collateral shall consist of the following assets of the Borrower and its subsidiaries, and all proceeds therefrom:

| **Asset** | **Description** |
|---|---|
| Storj Labs Inc. | All equity interests in, and all assets of, Storj Labs Inc., and its subsidiaries |
| Swarm Capital GMBH (Liechtenstein), Swarm Markets GMBH (Germany), and Swarmx GMBH (Germany) (collectively, the "Swarm Entities") | All equity interests in, and all assets of, the Swarm Entities and their respective subsidiaries.[1] |
| Rialto Trading Holdings, LLC | All equity interests in, and all assets of, Rialto Trading Holdings, LLC, and its subsidiaries |
| MANTRA $OM tokens | All Mantra or $OM Tokens that were received or may be received in the future by Borrower or any other member of Buyer's Group pursuant to the terms of (1) the Milestone Token Grant Agreement by and between MANTRA Chain Association and an affiliate of Borrower dated as of October 31, 2025 and (2) the NVNM Cooperation Agreement between MANTRA Group Holdings Limited and Borrower dated December 23, 2025, which $OM Tokens may be subject to lockup restrictions |

[1] Lenders acknowledge that an Inveniam subsdiary and the Swarm Entities are currently in discussions to unwind the transaction.

**EXHIBIT B**

**FORM OF SECURITY AGREEMENT**

[*See attached.*]

**Execution Version**

# SECURITY AGREEMENT

This Security Agreement (as amended, modified or otherwise supplemented from time to time, this "**Security Agreement**"), dated as of May 11, 2026, is executed by **Inveniam Capital Partners, Inc.**, a Delaware corporation having an address at 39500 High Pointe Drive Suite 200, Novi MI 48375 (together with its successors and assigns, "**Borrower**"), for itself and on behalf of its subsidiaries, in favor of **Collateral Agent** (as herein defined), for itself and on behalf of the former shareholders of Hedgehog Invest Limited, a limited company existing under the laws of England and Wales, in their capacities as lenders under the Note (as defined below) (individually, a "**Lender**" and collectively, the "**Lenders**").

## RECITALS

A. Borrower and Lenders are party to that certain Share Purchase Agreement, dated as of December 17, 2024 (the "**Purchase Agreement**"), pursuant to which, among other matters, Borrower issued a promissory note, dated as of even date therewith (as amended, modified, restated or otherwise supplemented from time to time, the "**Note**") in an aggregate principal amount of $9,609,265.57 (as the same may be adjusted pursuant to the terms of the Note), in favor of the Lenders.

B. Borrower is now in default under the Note and has requested that the Lenders forbear from exercising their rights and remedies with respect thereto.

C. In order to induce each Lender to so forbear from exercising such rights and remedies, and in consideration of each Lender's willingness to be bound by that certain Forbearance Agreement memorializing the same, to be entered into on the date hereof (the "**Forbearance Agreement**"), by and among Borrower, the Collateral Agent (for and on behalf of the Lenders), and the other parties thereto, Borrower has agreed to enter into this Security Agreement and to grant Collateral Agent, for the benefit thereof and of the Lenders, the security interest in the Collateral described below. In the event of a conflict between this Agreement and the Forbearance Agreement, the Forbearance Agreement shall govern.

## AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Borrower, acting for itself and on behalf of its subsidiaries, hereby agrees with Collateral Agent and the Lenders as follows:

1. Definitions and Interpretation. When used in this Security Agreement, the following terms have the following respective meanings:

"**Collateral**" has the meaning given to that term in Section 2 hereof.

"**Loan Documents**" means the Note, the Forbearance Agreement, and this Security Agreement, and all other agreements, contracts, undertakings, instruments, certificates, and other documents referenced therein or contemplated thereby.

"**Obligations**" means all loans, advances, debts, liabilities and obligations, howsoever arising, owed by Borrower to any of Collateral Agent and the Lenders of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of the Loan Documents, including, all interest, fees, charges, expenses,

attorneys' fees and costs and accountants' fees and costs chargeable to and payable by Borrower hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"**UCC**" means the Uniform Commercial Code as in effect in the State of Delaware from time to time.

All capitalized terms not otherwise defined herein shall have the respective meanings given in the Forbearance Agreement. Unless otherwise defined herein, all terms defined in the UCC have the respective meanings given to those terms in the UCC.

2. Grant of Security Interest. As security for the Obligations, Borrower hereby pledges to Collateral Agent and grants to Collateral Agent a senior security interest in all right, title and interests of Borrower and its subsidiaries in and to the property described in Attachment 1 hereto, whether now existing or hereafter from time to time acquired (collectively, the "**Collateral**"). In the event that, during the term of this Agreement, any dividend, reclassification, recapitalization, readjustment or other change is declared or made in the capital structure of any issuer of capital stock, limited liability company membership interests, partnership interests, or other equity interests included in the Collateral, then Collateral Agent shall have a security interest in all securities issued to or acquired by Borrower or any of its affiliates by reason of such event, and such securities shall become part of the Collateral

3. Delivery of Collateral Securities. All certificates or instruments, if any, representing or evidencing the capital stock, limited liability company membership interests, partnership interests, or other equity interests included in the Collateral (the "**Collateral Securities**") shall be delivered to and held by or on behalf of the Collateral Agent and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Collateral Agent. In addition, the Collateral Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Collateral Securities for certificates or instruments of smaller or larger denominations. Borrower hereby agrees that Collateral Agent may take any action, and Borrower will take any action specified by Collateral Agent, to cause Collateral Agent to have a first priority lien on, and security interest, the Collateral Securities. Borrower irrevocably authorizes and instructs each issuer of Collateral Securities to comply with any instruction received by such issuer from Collateral Agent with respect to such Collateral Securities, and Borrower agrees that each such issuer shall be fully protected in so complying; provided, however, that Collateral Agent agrees that Collateral Agent will not issue or deliver any such instructions to any such issuer except upon or after the occurrence of a Forbearance Event of Default.

4. General Representations and Warranties. Borrower represents and warrants to Collateral Agent and the Lenders that (a) Borrower is the direct or indirect owner of the Collateral (or, in the case of after-acquired Collateral, at the time Borrower acquires rights in the Collateral, will be the owner thereof) and that no other Person has (or, in the case of after-acquired Collateral, at the time Borrower directly or indirectly acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the Collateral, other than Permitted Liens; (b) upon the filing of UCC-1 financing statements in the appropriate filing offices, Collateral Agent has (or in the case of after-acquired Collateral, at the time Borrower directly or indirectly acquires rights therein, will have) a perfected senior security interest in the Collateral to the extent that a security interest in the Collateral can be perfected by such filing, except for Permitted Liens; (c) all accounts receivable and payment intangibles are genuine and enforceable against the party obligated to

pay the same; (e) the originals of all documents evidencing all direct and indirect accounts receivable and payment intangibles of Borrower and the only original books of account and records of Borrower relating thereto are, and will continue to be, kept at the address of the Borrower set forth in clause 9 of the Purchase Agreement; (f) all of the Collateral Securities have been duly and validly issued, are fully paid and nonassessable, and are owned directly or indirectly by Borrower free of any security interests or liens except for the Collateral Agent's security interest hereunder; and (g) Borrower has the right to vote, pledge and grant a security interest in or otherwise transfer its direct or indirect portion of the Collateral Securities without the consent of any other person and free of any security interests or liens, and without any restriction by Borrower or any issuer of Collateral Securities or any agreement among such issuer's shareholders, partners or members.

5. Covenants Relating to Collateral. Borrower hereby agrees at the Borrower's cost and expense (a) to perform all acts that may be necessary to maintain, preserve, protect and perfect the Collateral, the Lien granted to Collateral Agent therein and the perfection and priority of such Lien, except for Permitted Liens; (b) not to use or permit any Collateral to be used (i) in violation in any material respect of any applicable law, rule or regulation, or (ii) in violation of any policy of insurance covering the Collateral; (c) to pay promptly when due all taxes and other governmental charges, all Liens and all other charges now or hereafter imposed upon or affecting any Collateral; (d) without 30 days' written notice to Collateral Agent, (i) not to change Borrower's name or place of business (or, if Borrower has more than one place of business, its chief executive office), or the office in which Borrower's records relating to accounts receivable and payment intangibles are kept, or (ii) not to change Borrower's state of incorporation; and (e) to procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by Collateral Agent to perfect, maintain and protect its Lien hereunder and the priority thereof and to deliver promptly upon the request of Collateral Agent all originals of Collateral consisting of instruments.

6. Authorized Action by Collateral Agent. Borrower hereby irrevocably appoints Collateral Agent as its and its subsidiaries' attorney-in-fact (which appointment is coupled with an interest) and agrees that Collateral Agent may perform (but Collateral Agent shall not be obligated to and shall incur no liability to Borrower or any third party for failure so to do) any act which Borrower is obligated by this Security Agreement to perform, and to exercise such rights and powers as Borrower or its subsidiaries might exercise with respect to the Collateral, including the right to (a) collect by legal proceedings or otherwise and endorse, receive and receipt for all dividends, interest, payments, proceeds and other sums and property now or hereafter payable on or on account of the Collateral; (b) enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for the Collateral; (c) make any compromise or settlement, and take any action it deems advisable, with respect to the Collateral; (d) insure, process and preserve the Collateral; (e) pay any indebtedness of Borrower or its subsidiaries relating to the Collateral; and (f) file UCC financing statements and execute other documents, instruments and agreements required hereunder; provided, however, that Collateral Agent shall not exercise any such powers granted pursuant to subsections (a) through (e) prior to the occurrence of a Forbearance Event of Default and shall only exercise such powers during the continuance of a Forbearance Event of Default. Borrower agrees to reimburse Collateral Agent upon demand for any reasonable costs and expenses, including attorneys' fees, Collateral Agent may incur while acting as Borrower's or its subsidiaries' attorney-in-fact hereunder, all of which costs and expenses are included in the Obligations. It is further agreed and understood between the parties hereto that such care as Collateral Agent gives to the safekeeping of its own property of like kind shall constitute reasonable care of the Collateral when in Collateral Agent's possession; provided, however, that Collateral Agent shall not be required to make any presentment, demand or protest, or give any notice and need not take any action to preserve any rights against any prior party or any other person in connection with the Obligations or with respect to the Collateral.

7. Default and Remedies.

(a) Default. Borrower shall be deemed in default under this Security Agreement upon the occurrence and during the continuance of a Forbearance Event of Default.

(b) Remedies Generally. Upon the occurrence and during the continuance of a Forbearance Event of Default, the Collateral Agent shall have the right to exercise all of the remedies conferred hereunder, and the Collateral Agent shall have all the rights and remedies of a secured party under the UCC. Without limitation, the Collateral Agent shall have the following rights and powers, in each case:

(i) immediately upon a Forbearance Event of Default, Borrower hereby irrevocably for itself and on behalf of its subsidiaries conveys, transfers, and assigns to Collateral Agent, and Collateral Agent hereby accepts, all of Borrower's and its subsidiaries' right, title, and interest in the Collateral;

(ii) the Collateral Agent shall have the right to take possession of the Collateral and, for that purpose, enter, with the aid and assistance of any person, any premises where the Collateral, or any part thereof, is or may be placed and remove the same, and the Borrower shall assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at such Borrower's premises or elsewhere, and make available to the Collateral Agent, without rent, all of the Borrower's respective premises and facilities for the purpose of the Collateral Agent's taking possession of, removing or putting the Collateral in saleable or disposable form;

(iii) the Collateral Agent shall have the right to sell, lease or otherwise dispose of and deliver all or any part of the Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as the Collateral Agent may determine without further notice to the Borrower;

To the extent permitted under applicable law, the Borrower waives any and all rights that it or its subsidiaries may have to a judicial hearing in advance of the enforcement of any of the Collateral Agent's rights and remedies hereunder, including, without limitation, its right following a Forbearance Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

(c) Remedies Specific to Collateral Securities. If any Forbearance Event of Default shall have occurred and be continuing, all rights of the Borrower and its subsidiaries to (i) exercise the voting and other consensual rights it would otherwise be entitled to exercise in respect of the Collateral Securities, and (ii) receive the dividends and other distributions which it would otherwise be entitled to receive and retain in respect of the Collateral Securities, shall immediately cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole right to exercise such voting and other consensual rights and receive and hold such dividends and other distributions as Collateral. In connection with the foregoing, Borrower for itself and on behalf of its subsidiaries hereby grants to Collateral Agent, effective during the existence of a Forbearance Event of Default, an **IRREVOCABLE PROXY** pursuant to which Collateral Agent shall, as if Collateral Agent were a direct holder of the Collateral Securities, be entitled (but shall not be obligated) to exercise all voting powers pertaining to the Collateral Securities, including to call and attend all meetings of the shareholders, members or partners of the issuer(s) of the Collateral Securities to be held from time to time with full power to act and vote in the name, place and stead of Borrower and its subsidiaries, give consents, waivers and ratifications in respect of the Collateral Securities and otherwise act with respect thereto as though it were the outright beneficial owner and record holder thereof, and any and all proxies theretofore executed by

such Borrower and its subsidiaries shall terminate and thereafter be null and void and of no effect whatsoever. If a Forbearance Event of Default occurs and is continuing, the Collateral Agent shall further have the right, at any time in its discretion and without notice to the Borrower or any of its subsidiaries, to transfer to or to register in the name of the Collateral Agent or any of its nominees any or all of the Collateral Securities. The foregoing remedies in respect of the Collateral Securities are in addition to, and are not in lieu of, the general remedies available to the Collateral Agent in respect of the Collateral set forth elsewhere in this Security Agreement.

(d) Compliance with Securities Laws. The parties agree that in any foreclosure sale of the Collateral, the Collateral Agent may restrict the bidders to those who will represent that they are purchasing for investment only and not with a view to distribution, and who are "accredited investors" (as defined in Regulation D of the Securities Act of 1933). The Borrower agrees for itself and on behalf of its subsidiaries that a sale so conducted shall be deemed to be "commercially reasonable" under the UCC, provided that the Collateral could not be publicly offered at that time.

(e) Application of Collateral Proceeds. The proceeds of any such sale, lease or other disposition of the Collateral hereunder or from payments made on account of any insurance policy insuring any portion of the Collateral shall (i) first be applied to all costs, fees and expenses paid or incurred by the Collateral Agent or the Lenders in connection with the exercise, protection or enforcement of the rights and remedies of the Collateral Agent and the Lenders hereunder, (ii) second in satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, and (iii) third, the excess, if any shall be paid to the Borrower or whomever is legally entitled to receive the same. In the event that a Lender receives payments or distributions in excess of its pro rata interest in the Note (determined in accordance with the Lenders' respective percentage interests set forth on Schedule 1 to the Note), then such Lender shall hold in trust all such excess payments or distributions for the benefit of the other Lenders and shall pay such amounts held in trust to such other Lenders upon demand by such Lenders.

8. Collateral Agent.

(a) Appointment. The Lenders hereby appoint each of Michael Ward and Robert Lamb (and any replacement "Sellers' Representatives" appointed by the Lenders pursuant to the Purchase Agreement) as collateral agent for the Lenders under this Security Agreement (the foregoing appointees, acting individually or collectively in such capacity, the "**Collateral Agent**") to serve from the date hereof until the termination of the Security Agreement.

(b) Powers and Duties of Collateral Agent, Indemnity by Lenders.

(i) Each Lender hereby irrevocably authorizes the Collateral Agent to take such action and to exercise such powers hereunder as provided herein or as requested in writing by those Lenders holding a majority in interest in the Note (determined in accordance with the Lenders' respective percentage interests set forth on Schedule 1 to the Note) in accordance with the terms hereof, together with such powers as are reasonably incidental thereto. Collateral Agent may execute any of its duties hereunder by or through agents or employees and shall be entitled to request and act in reliance upon the advise of counsel concerning all matters pertaining to its duties hereunder and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance therewith.

(ii) Neither the Collateral Agent nor any of its directors, officers or employees shall be liable or responsible to any Lender or to Borrower for any action taken or omitted to be taken by Collateral Agent or any other such person hereunder or under any related agreement, instrument or document,

except in the case of gross negligence or willful misconduct on the part of the Collateral Agent, nor shall the Collateral Agent or any of its directors, officers or employees be liable or responsible for (i) the validity, effectiveness, sufficiency, enforceability or enforcement of the Note, this Security Agreement or any instrument or document delivered hereunder or relating hereto; (ii) the title of Borrower to any of the Collateral or the freedom of any of the Collateral from any prior or other liens or security interests; (iii) the determination, verification or enforcement of Borrower's compliance with any of the terms and conditions of this Security Agreement; (iv) the failure by Borrower to deliver any instrument or document required to be delivered pursuant to the terms hereof; or (v) the receipt, disbursement, waiver, extension or other handling of payments or proceeds made or received with respect to the collateral, the servicing of the Collateral or the enforcement or the collection of any amounts owing with respect to the Collateral.

(iii) In the case of this Security Agreement and the transactions contemplated hereby and any related document relating to any of the Collateral, each of the Lenders agrees to pay to the Collateral Agent, on demand, its pro rata share (determined in accordance with the Lenders' respective percentage interests set forth on Schedule 1 to the Note) of all fees and all expenses incurred in connection with the operation and enforcement of this Security Agreement, the Note or any related agreement to the extent that such fees or expenses have not been paid by Borrower. In the case of this Security Agreement and each instrument and document relating to any of the Collateral, each of the Lenders and the Borrower hereby agrees to hold the Collateral Agent harmless, and to indemnify the Collateral Agent from and against any and all loss, damage, expense or liability which may be incurred by the Collateral Agent under this Security Agreement and the transactions contemplated hereby and any related agreement or other instrument or document, as the case may be, unless such liability shall be caused by the willful misconduct or gross negligence of the Collateral Agent.

9. Miscellaneous.

(a) Notices. Except as otherwise provided herein, all notices, requests, demands, consents, instructions or other communications to or upon Borrower or Collateral Agent under this Security Agreement shall be made and become effective pursuant to the terms of clause 9 of the Purchase Agreement.

(b) Termination of Security Interest. Upon the payment in full of all Obligations, the security interest granted herein shall terminate and all rights to the Collateral shall revert to Borrower. Upon such termination Collateral Agent hereby authorizes Borrower to file any UCC termination statements necessary to effect such termination and Collateral Agent will execute and deliver to Borrower any additional documents or instruments as Borrower shall reasonably request to evidence such termination.

(c) Nonwaiver. No failure or delay on Collateral Agent's part in exercising any right hereunder shall operate as a waiver thereof or of any other right nor shall any single or partial exercise of any such right preclude any other further exercise thereof or of any other right.

(d) Amendments and Waivers. This Security Agreement may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by Borrower and Collateral Agent. Each waiver or consent under any provision hereof shall be effective only in the specific instances for the purpose for which given.

(e) Assignments. This Security Agreement shall be binding upon and inure to the benefit of Collateral Agent and Borrower and their respective successors and assigns; provided, however, that Borrower

may not sell, assign or delegate rights and obligations hereunder without the prior written consent of Collateral Agent.

(f) Cumulative Rights, etc. The rights, powers and remedies of Collateral Agent under this Security Agreement shall be in addition to all rights, powers and remedies given to Collateral Agent by virtue of any applicable law, rule or regulation of any governmental authority, any Transaction Document or any other agreement, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently without impairing Collateral Agent's rights hereunder. Borrower waives any right to require Collateral Agent to proceed against any person or entity or to exhaust any Collateral or to pursue any remedy in Collateral Agent's power. The Borrower acknowledges that a breach or threatened breach of the Borrower's or its subsidiaries' obligations under this Agreement would give rise to irreparable harm to the Collateral Agent and the Lenders, for which monetary damages may not be an adequate remedy. The Borrower therefore hereby agrees that, in the event of a breach or a threatened breach by the Borrower or its subsidiaries of any such obligations, the Collateral Agent and the Lenders shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(g) Payments Free of Taxes, Etc. All payments made by Borrower hereunder or under the Note shall be made by Borrower free and clear of and without deduction for any and all present and future taxes, levies, charges, deductions and withholdings. In addition, Borrower shall pay upon demand any stamp or other taxes, levies or charges of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Security Agreement. Upon request by Collateral Agent, Borrower shall furnish evidence satisfactory to Collateral Agent that all requisite authorizations and approvals by, and notices to and filings with, governmental authorities and regulatory bodies have been obtained and made and that all requisite taxes, levies and charges have been paid.

(h) Partial Invalidity. If at any time any provision of this Security Agreement is or becomes illegal, invalid or unenforceable in any respect under the law or any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Security Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(i) Construction. This Security Agreement is the result of negotiations among, and has been reviewed by, Borrower, Lenders, Collateral Agent and their respective counsel. Accordingly, this Security Agreement and the other Transaction Documents shall be deemed to be the product of all parties hereto, and no ambiguity shall be construed in favor of or against Borrower, Lenders or Collateral Agent.

(j) Entire Agreement. This Security Agreement taken together with Note, the Purchase Agreement and the other Transaction Documents constitute and contain the entire agreement of Borrower, Lenders and Collateral Agent, and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties (whether written or oral), respecting the subject matter hereof.

(k) Other Interpretive Provisions. References in this Security Agreement to any document, instrument or agreement (a) includes all exhibits, schedules and other attachments thereto, (b) includes all documents, instruments or agreements issued or executed in replacement thereof, and (c) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time. The words "hereof," "herein" and "hereunder" and words of similar

import when used in this Security Agreement refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement. The words "include" and "including" and words of similar import when used in this Security Agreement shall not be construed to be limiting or exclusive.

(l) Governing Law. This Security Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to conflicts of law rules (except to the extent governed by the UCC).

(m) Counterparts. This Security Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

(*The remainder of this page is intentionally left blank*)

IN WITNESS WHEREOF, the Borrower, Collateral Agent and the Lenders have caused this Security Agreement to be executed as of the day and year first above written.

**BORROWER**:

**Inveniam Capital Partners, Inc.**

Robert Yablunsky (2026-05-12 15:40:05 EDT)

By: ______________________________

Name: Robert Yablunsky

Its: EVP

**COLLATERAL AGENT:**

Michael Ward (2026-05-12 21:45:42 GMT+1)

Michael Ward

Rob Lamb (2026-05-12 21:20:40 GMT+1)

Robert Lamb

**LENDERS**:

Michael Ward (2026-05-12 21:45:42 GMT+1)

Michael Ward, in his capacity as Sellers' Representative for and on behalf of the Lenders

Rob Lamb (2026-05-12 21:20:40 GMT+1)

Robert Lamb, in his capacity as Sellers' Representative for and on behalf of the Lenders

(*Signature page to Security Agreement*)

**ATTACHMENT 1**

**TO SECURITY AGREEMENT**

The Collateral shall consist of the following assets of the Borrower and its subsidiaries, and all proceeds therefrom:

| Asset | Description |
|---|---|
| Storj Labs Inc. | All equity interests in, and all assets of, Storj Labs Inc., and its subsidiaries |
| Swarm Capital GMBH (Liechtenstein), Swarm Markets GMBH (Germany), and Swarmx GMBH (Germany) (collectively, the "Swarm Entities") | All equity interests in, and all assets of, the Swarm Entities and their respective subsidiaries[1] |
| Rialto Trading Holdings, LLC | All equity interests in, and all assets of, Rialto Trading Holdings, LLC, and its subsidiaries |
| MANTRA $OM tokens | All Mantra or $OM Tokens that were received or may be received in the future by Borrower or any other member of Buyer's Group pursuant to the terms of (1) the Milestone Token Grant Agreement by and between MANTRA Chain Association and an affiliate of Borrower dated as of October 31, 2025 and (2) the NVNM Cooperation Agreement between MANTRA Group Holdings Limited and Borrower dated December 23, 2025, which $OM Tokens may be subject to lockup restrictions |

[1] Lenders acknowledge that an Inveniam subsdiary and the Swarm Entities are currently in discussions to unwind the transaction.

**EXHIBIT C**

**CAPITALIZATION**

[*See attached.*]

## FULLY DILUTED CAPITALIZATION TABLE

*(Based on Captable 3.31.2026)*

| SUMMARY | Shares/Units | % Ownership |
|---|---|---|
| Outstanding Common & Preferred (Captable 3.31.2026) | 62,246,366 | 49.30% |
| Warrants (Warrant Dilution) | 1,558,730 | 1.23% |
| Stock Options - Employee (Options Dilution) | 2,582,917 | 2.05% |
| Stock Options - Storj (Options Dilution) | 3,976,749 | 3.15% |
| SARs (SAR's Dilution) | 20,068,180 | 15.89% |
| Convertible Notes (Convertible Note Dilution) | 3,620,645 | 2.87% |
| Class D Common (Unvested Restricted Stock) | 6,956,560 | 5.51% |
| ICPM Class A shares (share ownership 20%) | 10 | 20.00% |
| **FULLY DILUTED SHARES OUTSTANDING** | **101,010,148** | **100.00%** |

| SHAREHOLDER TOTALS | Total Shares | % Fully Diluted |
|---|---|---|
| **Total from Cap Table (All Shareholders)** | **62,246,366** | **61.62%** |
| **Total Fully Diluted Shares Outstanding** | **101,010,148** | **100.00%** |

**NOTES & ASSUMPTIONS**

1. All shareholders listed from 'Captable3.31.2026' sheet with Total Shares > 0
2. Outstanding Shares: Includes all share classes (Common, Restricted, and Preferred)
3. Warrants: Include all equity warrants from 'Warrants Dilution' sheet
4. Stock Options: Include employee NQSOs and Storj options from 'Options Dilution' sheet
5. SARs: Include all Stock Appreciation Rights from 'SAR's Dilution' sheet
6. Convertible Notes: DevPro convertible notes shown at full conversion value
7. Fully diluted assumes all instruments convert/exercise (treasury stock method not applied)
8. All percentages calculated against total fully diluted share count (cell B13)
9. Dilution is assumed at $9.50/share

**ICPM Cap Table 3/31/2026**

| # | Row Labels | Signatory | Class A Common | Class B Common | Class C Common | Class C Common Restricted | Total ICPM Non-diluted | Class C Common (Stock Options) | Strike price | Share Dilution from Options at $35.38 per share | Total Diluted shares |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Investors | Investors | - | - | 2,268 | - | 2,268 | - | | | 2,268.00 |
| 2 | Investors | Investors | 25,000 | - | - | - | 25,000 | - | | | 25,000.00 |
| 3 | Investors | Investors | - | - | 45,352 | - | 45,352 | - | | | 45,352.00 |
| 4 | Investors | Investors | - | 99,338 | - | - | 99,338 | - | | | 99,338.00 |
| 5 | Investors | Investors | - | - | 2,268 | - | 2,268 | - | | | 2,268.00 |
| 6 | Investors | Investors | 50,000 | - | - | - | 50,000 | - | | | 50,000.00 |
| 7 | Investors | Investors | - | - | 1,134 | - | 1,134 | - | | | 1,134.00 |
| 8 | Investors | Investors | - | - | 394 | - | 394 | - | | | 394.00 |
| 9 | Investors | Investors | - | - | 2,268 | - | 2,268 | - | | | 2,268.00 |
| 10 | Investors | Investors | - | - | 5,669 | - | 5,669 | - | | | 5,669.00 |
| 11 | Investors | Investors | 40,000 | - | - | - | 40,000 | 84,000 | $ 5.00 | 72,128.89 | 112,128.89 |
| 12 | Investors | Investors | - | - | 1,134 | - | 1,134 | - | | | 1,134.00 |
| 13 | Investors | Investors | - | - | - | - | 0 | 24,000 | $ 5.00 | 20,608.25 | 20,608.25 |
| 14 | Investors | Investors | - | 116,670 | - | - | 116,670 | 84,000 | $ 5.00 | 72,128.89 | 188,798.89 |
| 15 | Investors | Investors | - | - | 0 | - | 0 | - | | | - |
| 16 | Investors | Investors | 70,000 | 210,436 | - | - | 280,436 | - | | | 280,436.00 |
| 17 | Investors | Investors | - | - | 567 | - | 567 | - | | | 567.00 |
| 18 | Investors | Investors | - | - | - | 122,500 | 122,500 | - | | | 122,500.00 |
| 19 | Investors | Investors | - | - | 4,535 | - | 4,535 | - | | | 4,535.00 |
| 20 | Investors | Investors | 50,000 | - | - | - | 50,000 | - | | | 50,000.00 |
| 21 | Investors | Investors | - | 58,335 | 8,213 | - | 66,548 | 96,000 | $ 5.00 | 82,433.01 | 148,981.01 |
| 22 | Investors | Investors | - | - | 2,268 | - | 2,268 | - | | | 2,268.00 |
| 23 | Investors | Investors | - | - | 2,268 | - | 2,268 | - | | | 2,268.00 |
| 24 | Investors | Investors | - | 16,219 | - | - | 16,219 | - | | | 16,219.00 |
| 25 | Investors | Investors | - | - | 1,654,000 | - | 1,654,000 | - | | | 1,654,000.00 |
| 26 | Investors | Investors | - | - | 3,401 | - | 3,401 | - | | | 3,401.00 |
| 27 | Investors | Investors | - | - | 169 | - | 169 | - | | | 169.00 |
| 28 | Investors | Investors | 200,000 | - | - | - | 200,000 | - | | | 200,000.00 |
| 29 | Investors | Investors | - | - | - | 35000 | 35,000 | 36,000 | $ 5.00 | 30,912.38 | 65,912.38 |
| 30 | Investors | Investors | - | - | - | - | 0 | - | | | - |
| 31 | Investors | Investors | - | - | - | 122,500 | 122,500 | - | | | 122,500.00 |
| 32 | Investors | Investors | - | - | 2,898 | - | 2,898 | - | | | 2,898.00 |
| 33 | Investors | Investors | 25,000 | - | - | - | 25,000 | - | | | 25,000.00 |
| 34 | Investors | Investors | - | - | 9,662 | - | 9,662 | - | | | 9,662.00 |
| 35 | Investors | Investors | - | - | - | - | 0 | - | | | - |
| 36 | Investors | Investors | - | - | 11,338 | - | 11,338 | - | | | 11,338.00 |
| 37 | Investors | Investors | - | - | 24,155 | - | 24,155 | - | | | 24,155.00 |
| 38 | Investors | Investors | - | - | 1,134 | - | 1,134 | - | | | 1,134.00 |
| 39 | Investors | Investors | - | - | 18,141 | - | 18,141 | - | | | 18,141.00 |
| 40 | Investors | Investors | - | - | 1,134 | - | 1,134 | - | | | 1,134.00 |
| 41 | Investors | Investors | - | - | - | - | 0 | - | | | - |
| 42 | Investors | Investors | - | - | 2,334 | - | 2,334 | - | | | 2,334.00 |
| 43 | Investors | Investors | 130,000 | 302,674 | - | 31,084 | 463,758 | 120,000 | $ 5.00 | 103,041.27 | 566,799.27 |
| 44 | Investors | Investors | 1,010,000 | 600,483 | - | 62,168 | 1,672,651 | 612,000 | $ 5.00 | 525,510.46 | 2,198,161.46 |
| 45 | Investors | Investors | - | - | 4,535 | - | 4,535 | - | | | 4,535.00 |
| 46 | Investors | Investors | - | 58,335 | - | - | 58,335 | - | | | 58,335.00 |
| 47 | Investors | Investors | 310,000 | 361,061 | - | 31,084 | 702,145 | 120,000 | $ 5.00 | 103,041.27 | 805,186.27 |
| 48 | Investors | Investors | - | - | 1,134 | - | 1,134 | - | | | 1,134.00 |
| 49 | Investors | Investors | - | 133,803 | - | - | 133,803 | - | | | 133,803.00 |
| 50 | Investors | Investors | - | - | - | - | 0 | 12,000 | $ 5.00 | 10,304.13 | 10,304.13 |
| 51 | Investors | Investors | 60,000 | - | - | - | 60,000 | - | | | 60,000.00 |
| 52 | Investors | Investors | 30,000 | - | - | - | 30,000 | - | | | 30,000.00 |
| 53 | Investors | Investors | - | - | - | - | 0 | - | | | - |
| 54 | Investors | Investors | - | - | 6,803 | - | 6,803 | - | | | 6,803.00 |
| 55 | Investors | Investors | - | - | 1,134 | - | 1,134 | - | | | 1,134.00 |
| 56 | Investors | Investors | - | - | 2,268 | - | 2,268 | - | | | 2,268.00 |
| 57 | Investors | Investors | - | 6,082 | - | - | 6,082 | - | | | 6,082.00 |
| 58 | Investors | Investors | - | 36,492 | - | - | 36,492 | - | | | 36,492.00 |
| 59 | Investors | Investors | - | - | 11,338 | - | 11,338 | - | | | 11,338.00 |
| 60 | Hedgehog Inves | Michael Ward | - | - | 361,273 | - | 361,273 | - | | | 361,273.00 |
| 61 | Investors | Investors | - | - | 7,971 | - | 7,971 | - | | | 7,971.00 |
| 62 | Investors | Investors | - | - | 7,971 | - | 7,971 | - | | | 7,971.00 |
| 63 | Investors | Investors | - | - | - | - | 0 | - | | | - |
| 64 | Investors | Investors | - | - | 27,343 | - | 27,343 | - | | | 27,343.00 |
| | | | | | | | | | | | - |
| | **Total Issued** | | 2,000,000 | 1,999,928 | 2,238,474 | 404,336 | 6,642,738 | 1,188,000 | | 1,020,109 | 7,662,847 |

DRAFT 1/27/2026

# Corporate Structure

## Inveniam Capital Management

- Parent Company
- Operating Business
- No active business
- Not yet acquired

Entities are 100% owned by Inveniam Capital Partners, Inc. (ICP) unless appearing in dark brown or otherwise indicated.




* Silver Harbor Partners, LP is owned 51% by a General Partner and 49% by a Limited Partner. Inveniam Capital Partners, Inc. owns 49% of the GP and 100% of the LP. An individual acquired 51% of the GP as a result of transactions that occurred in Q4 2025.
Silver Harbor Partners, LP is a private eeuity fund which invests and/or manages the following entities through Inveniam Blockchain Infrastructure and Growth GP, LLC: MIV1, LLC (Delaware), Inveniam HUB Holdings, LLC (Delaware), TIV1, LLC (Delaware), and Inveniam Capital Partners, Inc. (less than 5%).



DRAFT 1/27/2026

# Corporate Structure

## Inveniam Data Marketplace

- Parent Company
- Operating Business
- No active business

Entities are 100% owned by Inveniam Capital Partners, Inc. (ICP) unless otherwise indicated.



DRAFT 1/27/2026

## Corporate Structure

### Inveniam IO/Data Operations



## SCHEDULES

Schedule 5.1(g) – Accuracy of Financial Information

None.

Schedule 5.1(h) – No Litigation

None.

Schedule 5.1(i) – Absence of Certain Proceedings

None.

Schedule 8.1(v) – Payment of Taxes

None.

# 2026_5_12_Forbearance_Clean

Final Audit Report 2026-05-12

| | |
|---|---|
| Created: | 2026-05-12 (Eastern Daylight Time) |
| By: | Daniel Baron (dbaron@inveniam.io) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAPQxPxBnt-jAyWHH09orQ7QM2BBv8eFFX |

## "2026_5_12_Forbearance_Clean" History

Document created by Daniel Baron (dbaron@inveniam.io)
2026-05-12 - 1:00:13 PM EDT

Document emailed to Robert Yablunsky (byablunsky@inveniam.io) for signature
2026-05-12 - 1:04:31 PM EDT

Email viewed by Robert Yablunsky (byablunsky@inveniam.io)
2026-05-12 - 3:38:30 PM EDT

Document e-signed by Robert Yablunsky (byablunsky@inveniam.io)
Signature Date: 2026-05-12 - 3:40:05 PM EDT - Time Source: server - Signature Appearance Selected: DRAW

Document emailed to roblamb1981@gmail.com for signature
2026-05-12 - 3:40:09 PM EDT

Email viewed by roblamb1981@gmail.com
2026-05-12 - 4:19:32 PM EDT

Signer roblamb1981@gmail.com entered name at signing as Rob Lamb
2026-05-12 - 4:20:38 PM EDT

Document e-signed by Rob Lamb (roblamb1981@gmail.com)
Signature Date: 2026-05-12 - 4:20:40 PM EDT - Time Source: server - Signature Appearance Selected: MOBILE_TYPE

Document emailed to wardmj89@gmail.com for signature
2026-05-12 - 4:20:42 PM EDT

Email viewed by wardmj89@gmail.com
2026-05-12 - 4:37:00 PM EDT

Signer wardmj89@gmail.com entered name at signing as Michael Ward
2026-05-12 - 4:45:40 PM EDT

Document e-signed by Michael Ward (wardmj89@gmail.com)

Signature Date: 2026-05-12 - 4:45:42 PM EDT - Time Source: server - Signature Appearance Selected: TYPE

Agreement completed.

2026-05-12 - 4:45:42 PM EDT